Filed 5/4/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049867 |
| v. | (Super. Ct. No. 13NF1076) |
| TRAVIS JORDAN BROWN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Lance Jensen, Judge.  Reversed in part, affirmed in part, and remanded.

Dacia A. Burz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Annie Fraser and Alastair J. Agcaoili, Deputy Attorneys General, and Kathleen Vermazen Radez, Deputy State Solicitor General, for Plaintiff and Respondent.

The amended information in this matter charged defendant Travis Jordan Brown with one count each of murder (Pen. Code,[1] § 187, subd. (a); count one) and active participation in a criminal street gang (§ 186.22, subd. (a); count two). It alleged the murder was for the benefit of and in association with a criminal street gang (§ 186.22, subd. (b)), and further alleged a special circumstance allegation that the victim was "intentionally killed" while defendant was an active gang member and that the murder was carried out to further the activities of the criminal street gang (§ 190.2, subd. (a)(22)). Lastly, it alleged a number of firearm allegations in connection with the charged murder: that defendant personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)); personally used a firearm in the commission of the murder (§ 12022.5, subd. (a)); and vicariously discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (d), (e)(1)). The charged incident was alleged to have occurred on July 11, 2008. The trial took place in December 2013.

The defense was that defendant was not the shooter. The person defendant contends was the shooter, Kevin Martinez, was the only witness to say defendant was the shooter. Martinez, who was interrogated by the police about the shooting, pled guilty to a lesser crime in exchange for a six-year sentence and his agreement to testify against defendant, after following a police officer's lead to say he was not the shooter and did not know there was going to be a shooting. There was evidence the shooter was left-handed, Martinez is left-handed, defendant is right-handed, and Martinez matched the general description of the shooter.

Defendant was prosecuted for first degree murder under three different theories: he was the actual killer (shooter); he aided and abetted the murder with the intent to kill; and he was liable under the natural and probable consequence theory of aider and abetter liability. The latter theory is legally impermissible. (*People v. Chiu*

_____

[1] All undesignated statutory references are to the Penal Code.

2

(2014) 59 Cal.4th 155, 158-159.)  This error requires reversal unless we conclude beyond a reasonable doubt the jury rejected the natural and probable consequences theory of aiding and abetting.  (*Id*. at p. 167.)

During jury deliberations, the jury asked the court for further guidance on the natural and probable consequences theory of aiding and abetting liability.  It wanted the phrase "natural and probable consequence of the commission of fighting" clarified, and asked whether the court would "clarify the difference between probable and possible."  That same day, the jury notified the court it was unable to reach a verdict.  The form stating the jury was deadlocked was not signed or dated by the foreperson.  When the form was returned to the jury for the foreperson to date and sign, the bailiff was informed the note was withdrawn and the jury was again deliberating.

The jury then sent the following note to the court:  "Exhibit #22—clarify if [Flores] was indentifying the shooter or participant or what?"  At 4:15 p.m. that afternoon, the jury informed the bailiff it had a verdict, but would prefer to return to court the next day to render its verdict.  The bailiff retrieved the verdict forms for the court to review and the matter was continued to the next day.  The court reviewed the verdict forms and saw the signed and dated not guilty verdict form on the murder count had "withdrawl [sic]" and "void" written across it in large letters.  The court did not notify counsel of the irregularity.  The next day when the case reconvened, without discussing the matter with counsel, the court sent a note to the jury stating:  "The 'Not Guilty' form for Murder in the First Degree had 'withdrawal void' handwritten across the form.  The Court has taken out that form and replaced it with a clean copy.  [¶]  As to Count 2, under tab # 2, please date and sign the appropriate form for the verdict you have reached or indicate to the court by a question that you are unable to reach a verdict on Count 2 and therefore deadlocked."  Approximately 10 minutes later, the jury notified the court it was ready with its verdicts.

The court clerk read the guilty verdict forms for first degree murder and active participation in a criminal street gang. The jury found all the special allegations true, including that defendant both personally discharged and vicariously discharged a firearm causing great bodily injury or death. The clerk polled each juror as follows: "Is this your true and correct verdicts and findings as to all counts . . . ."

Only after the jury had been excused did the court explain what had occurred the day before regarding the prior not guilty form. Then, in what must have been a surprise to counsel, the court stated it reviewed the verdict forms from that day, just prior to reading the verdicts in court, and saw the blank not guilty form the court had supplied to replace the previous not guilty form was also dated and signed. In other words, in submitting its verdicts that day, the guilty and not guilty verdicts on count one, first degree murder, had both been signed and dated. The court unilaterally, and without notifying counsel beforehand and without inquiring of the jury, determined the second not guilty verdict form was "another mistake" and the correct verdict was guilty.

The court sentenced the defendant to life in prison without the possibility of parole (LWOP) on the murder count, imposed a consecutive 25 years to life on the personal discharge (§ 12022.53, subd. (d)) allegation, struck the section 186.22, subdivision (b) gang enhancement for sentencing purposes, found the vicarious discharge finding "moot," struck the firearm use enhancement (§ 12022.5, subd. (a)), and stayed the sentence on count two pursuant to section 654.

Aside from arguing the first degree murder conviction must be reversed under *People v. Chiu*, *supra*, 59 Cal.4th 155, defendant contends the true finding on the special circumstance allegation must be reversed because the court erred in instructing the jury on the allegation; the court prejudicially erred in connection with the original not guilty verdict submitted by the jury on the murder charge, when it had the jury reconsider its verdict; the court's ex parte communications with the jury violated his right to counsel

4

and due process; and in the alternative, counsel was ineffective for failing "to object after the fact" and move for a mistrial.

Under the totality of the circumstances we find in this record, we conclude that a number of factors here, besides being confounding, resulted in prejudice to defendant in this close case: 1) the jury was instructed on the natural and probable consequences theory of liability for first degree murder; 2) the court took a signed not guilty form the afternoon before a verdict was taken, which form had "withdrawl [sic]" and "void" written across it, without informing counsel; 3) the court gave the jury a blank not guilty verdict form and kept the signed form that had "withdrawl [sic]" and "void" written across it, without informing counsel; 4) the court instructed the jury concerning its verdict outside the presence of counsel and without informing counsel of the circumstances until after the guilty verdict was accepted and the jury was excused; and 5) upon reviewing the verdict forms just prior to announcing the guilty verdict for first degree murder, which forms included both a signed and dated guilty form and a signed and dated not guilty form for first degree murder, the court had only the guilty verdict form read aloud, without informing counsel about the signed and dated not guilty form. Consequently, defendant's conviction for first degree murder and the true findings on the attendant special allegations are reversed. The guilty verdict on count two, active participation in a criminal street gang, is not affected by these errors and is affirmed.

I

FACTS

*Prosecution Evidence*

On July 11, 2008, at approximately 10:00 p.m., Samuel Oh was in the front passenger seat of an automobile parked in a parking lot of a church in the 1400 block of Euclid Avenue in Anaheim, talking with a female friend after having returned to drop off a friend after a birthday party. The vehicle was facing the street. A northbound red sports utility vehicle (SUV) suddenly stopped in the middle of the street, despite heavy

5

traffic, catching his attention, and forcing traffic to go around the SUV. He saw three or four 18-to 20-year-old male Hispanics with shaved heads get out of the SUV. He believes the driver stayed in the SUV.

The victim had been walking on the side walk adjacent to Euclid Avenue with two friends. The males from the SUV pushed the two friends out of the way and surrounded the victim. Oh then heard a single gunshot and saw smoke from the gun, although he did not see the gun itself. The shooter, who Oh could not identify and who was wearing some sort of jersey, had his arm straight out in front of him when he shot the victim, who was right in front of the shooter. The victim's back was to Oh. As the victim started to fall, another of the males from the SUV hit the victim in the back with a baseball bat.

Prior to the shooting, it appeared to Oh as if there was going to be an argument. He heard some yelling, but could not hear what was said. After the shooting, the males from the SUV ran back to the SUV, got in, and sped away "really fast" northbound on Euclid Avenue. Oh called 911.

Erick Flores, was about 15 years old at the time of the time of the shooting and was friends with Ivan Sarmiento. He knew Sarmiento about two years before the night of the shooting. That night, Flores was with his ex-girlfriend, Sarmiento, and Sarmiento's brother Adrian. Sarmiento had just been released from jail and Flores was "catching up" with him. Sarmiento's girlfriend Marissa joined the group and when she needed to walk home, Flores offered to walk her home with Sarmiento. The three walked southbound on Euclid. When they got to a church, a red SUV passed them on the other side of the street. Flores' group "pretty much locked eyes" with the people in the SUV. There were two people in the front seat and three in the backseat. Someone inside the vehicle yelled, "What's up?" and the driver threw "B" and "D" gang handsigns out his window. Flores does not remember what the driver looked like, but he remembers telling

a police officer the driver looked to be about 19 years old, had a mustache, and wore a baseball hat.

When the SUV passed them, Sarmiento and Flores looked at each other and then back in the direction from which they had come. They saw Adrian about a quarter of a mile behind them.

Flores knew Sarmiento to be a Varrio Norwalk gang member. Adrian was an associate of the gang, but not a member. Sarmineto's moniker was "Little Brownie," and Adrian's was "Little Man." Flores's moniker was "Silent." Flores was interested in joining a gang at that time, but the events of that night changed his mind.

About 50 feet after passing Sarmineto, Marissa, and Flores, the SUV made a U-turn and drove back toward them on their side of the street. Sarmineto signaled Adrian to stay back. Sarmiento moved into the street. Marissa stayed back.

The SUV stopped right next to Flores, Sarmiento, and Marissa. Someone from the SUV asked the group if they "bang." A passenger from the driver's side of the SUV got out, carrying a silver baseball bat, and screamed, "Brown Demons." The individual with the bat was about 18 or 19 years old, "fat," and wore a white T-shirt and a baseball hat. Flores said Sarmiento confronted the bat wielder.

The right front passenger asked in Spanish if there was a problem, and got out of the SUV. Flores stepped up to the street. The front passenger was a male Hispanic, about 17 or 18 years old, light skinned, "kind of tallish," about five feet seven inches or five feet eight inches tall, "skinny," about 150 or 180 pounds, wore a baseball hat, and had a revolver. Flores does not remember whether the front passenger had a mustache. Flores said the right front passenger was about the same height as the male with the bat. According to Flores, only two people exited the vehicle. When Flores saw the gun, he backed up, tripped over the curb, and fell backwards. Prior to that, Flores glanced at Sarmiento and thought Sarmiento might have throw an "N" hand sign, but could not be sure.

7

The male with the gun took a step forward, looked at Flores who had fallen, and then shot Sarmiento. Flores said the male shot Sarmiento once and a few seconds later shot him again, got closer, and then shot Sarmiento in the face. Flores does not remember telling an officer there were two shots. Neither does he remember telling an officer there was a quiet pop with a lot of smoke, and that the second shot was much louder. Flores said the first shot was from about 10 feet and the second was "pointblank," with the gun pointed at Sarmiento's face. The shooter held the gun in his right hand.

According to Flores, the male with the bat was in front of Sarmiento when Sarmiento was shot in the face. Sarmiento fell to the ground face first. Once he was on the ground, the male with the bat hit him in the back with the bat. The two assailants got back into the SUV and the vehicle drove off northbound. Flores turned Sarmiento over and saw blood gushing from his eye. He waited with Sarmiento, holding Sarmiento's hand, and told people across the street to call for help.

Flores had never seen the assailants before. He was later shown photographs by a detective and was unable to identify anyone as the shooter. Flores does not remember telling an officer the shooter shot with his left hand.

Kevin Martinez, whose moniker is "Clever," was 15 years old on the night of the shooting and 21 years old at the time of trial. He was in custody while he testified. He was serving a six-year sentence for the shooting incident in this matter. About a week after the shooting he was interrogated by the police. He was placed in an interrogation room at about 6:00 a.m., without a shirt and wearing only a pair of shorts. His interrogation lasted until 7:00 or 8:00 p.m. that night. The room was so cold Martinez was shivering. He was offered a blanket, but turned it down because he did not want to police to trick him into thinking they were friends. He tried to be tough, but he was "freezing [his] butt off."

8

During the interrogation, Martinez was afraid he would serve life in prison for Sarmiento's killing. He felt he would have to implicate defendant so as not to go to prison for life. Police made him feel as if that was his only option. He said they made him feel the evidence was against him. They said they had witnesses and that they suspected he had touched the gun. The interrogating officer repeatedly told Martinez he could "get out in front of this." Martinez told the officer what he thought the officer wanted to hear. The officer told Martinez, "You can get out in front of this, tell me that you didn't know about it," and "You can get out in front of this. Tell me that you didn't do the shooting." The officer gave Martinez an out and Martinez took it. Martinez started implicating people during his interrogation in an effort to get out of doing a life sentence.

Martinez said he was involved in the South Side Brown Demons (Brown Demons), but had not yet been jumped into the gang. To jump into the gang, the person is beaten by members of the gang and then that person becomes one of the gang. Martinez was waiting for some members of the gang to get out of prison so they would then jump him in.

Martinez started running with the Brown Demons when he was 11 years old. He went to juvenile hall for possessing a switch blade knife. Then in August 2006, he went to juvenile hall again when he was caught spray painting "South Side Brown Demons" on a wall. He did other gang graffiti without getting caught. At the time of the shooting, Martinez was trying to "earn [his] stripes" to get into the gang.

Martinez knew defendant for three to four years before the shooting. He knew defendant, who is two years older, before he (Martinez) became involved with the Brown Demons. Defendant and Martinez "hung out" almost every day. They were best friends. Martinez knew about 20 members of the Brown Demons. He had heard of Varrio Norwalk, a rival gang, before the shooting.

In the afternoon, prior to the shooting, Martinez and defendant were drinking in an apartment in the area of Western and Lincoln Avenue. "Youngster" and "Vandal" picked them up and the four went to a friend's residence to continue drinking. Martinez said Youngster's first name is Charlie. Martinez knew him for three to four years. He knew Vandal for about two years and saw him about every other weekend. He does not know Vandal's name. Youngster and Vandal had been jumped into the Brown Demons and were gang members.

The group drove to the friend's residence in Vandal's SUV. They stayed for perhaps 15 minutes and then went back toward the gang's territory at Euclid Avenue and Ball Road. Vandal drove, defendant was in the right front passenger seat, Martinez sat behind defendant, and Youngster sat behind Vandal. Youngster had an aluminum bat and defendant had a .44-caliber magnum revolver. According to Martinez, he saw the gun with defendant "mostly everyday."

While they were driving, either defendant or Vandal said, "Hey, there goes those guys from Norwalk." Martinez knew the reference was to Varrio Norwalk. Martinez recognized Sarmiento from "the streets," and the girl with Sarmiento from juvenile hall. As they drove by the pedestrians, Vandal called out, "Brown Demons." Sarmiento did not say anything, but "thr[e]w up" a gang sign, shaping his hands to make an "N" for Norwalk.

At the time, the SUV was on Euclid Avenue and Sarmiento's group was walking southbound on the east side of the street. Vandal made a U-turn and stopped in the middle of the street. Youngster, Vandal, and Martinez got out of the SUV and approached Sarmiento, who walked toward them at the same time. Either Youngster or Vandal "hit up" Sarmiento, asking where he was from. Sarmiento said, "Norwalk." Martinez was there to backup the gang member because he expected a confrontation. He said that if Youngster or Vandal started throwing punches, he would jump in and help.

10

Defendant got out of the SUV last. Once he got out, he raised the gun and shot Sarmiento from "real close," which Martinez estimated to be two or three feet. This happened within seconds of defendant getting out of the SUV. Once Sarmiento had been shot, Youngster, Vandal, defendant, and Martinez fled back to the SUV and drove away. Martinez did not see Sarmiento fall and he never saw the gun after the shooting. Martinez said that at the time of the shooting, defendant was shorter and heavier that he was.

Officer Kerry Condon interrogated defendant on July 18, 2008, a week after the shooting. He estimated defendant was five feet seven inches or five feet eight inches tall on that day and estimated defendant weighed about 180 pounds. He said Martinez looked to be about five feet seven inches tall about two to four months after the shooting and weighed about 115 or 120 pounds.

After advising defendant of his *Miranda*[2] rights, Condon questioned him. Defendant initially denied knowing anything about the shooting. Later, he said he heard about it on the news. Condon asked if defendant would tell him about the incident if he had been involved in it. Defendant said, "It depends." He said it would depend on how much the officer knew. He said, "If you were, like [100] percent—like, if I knew you knew, then I would tell you, but I don't know."

Condon interrogated defendant again on January 15, 2009. Defendant was re-advised of his *Miranda* rights and agreed to speak with Condon. Defendant said he was partying with his friends Michael and Jared at their house on Friday night, July 11, 2008. Condon said he knows Jared and Michael and their house is four or five miles from the scene of the shooting. Defendant denied being with anyone from the Brown Demons that night. Jared and Michael are not members of the gang. Defendant admitted associating with the Brown Demons, but claimed he was having a problem with a Brown

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

11

Demon member whose name he did not know, but whose moniker was "Goofy." Defendant was unable to say what Goofy looked like. Goofy purportedly claimed defendant was spending too much time with Michael and Jared.

Defendant said he did not know about any problems between the Brown Demons and Varrio Norwalk, and that he had no problem with the latter gang. Although defendant continued to deny any involvement in the shooting, he said he thought the victim was the Varrio Norwalk member who lived in apartments by Ball Road and Euclid Avenue, and that he knew the victim. Condon told defendant others were saying he was the triggerman. Condon then said that if defendant would give his side of the story, he (Condon) would investigate it and prove defendant right. After that, defendant admitted being at the scene of the shooting, but denied being the shooter.

Defendant said he was in the backseat of a red truck. Goofy and "Bandit" were in the vehicle as well. Defendant said he did not know who owned the truck. Later, he said it belonged to Vandal's girlfriend and that he knew Vandal as Bandit. He later said Bandit/Vandal's name is Ricky. Defendant initially denied Martinez was in the vehicle, but that changed after Condon said he had talked to Martinez.

Eventually, defendant said Bandit/Vandal was driving, Martinez was in the front passenger seat, and Goofy was in the backseat with him. Defendant said he was sitting behind the driver. He said they were driving southbound on Euclid Avenue when Goofy yelled, "South Side Brown Demons." The driver made a U-turn and drove back to where the pedestrians were.

Defendant said Goofy got out of the vehicle. A few moments later, everyone else in the vehicle exited. Goofy confronted the victim while the rest of the group waited by the truck. Before defendant knew it, Goofy produced a gun and defendant heard a gunshot. He said Goofy was "right up in" Sarmiento's face when he shot Sarmiento. Defendant did not see the gun before the shooting, Goofy had not told

12

defendant he had a gun, and if defendant had known there was a gun in the vehicle, he would not have been in the vehicle. He said he did not know about the bat either.

Defendant said he was 15 feet away from Goofy when the shot was fired. Prior to the shooting, defendant heard "Brown Demons" and "Norwalk." Defendant said the whole thing "just unfolded." According to defendant, he ran from the scene of the shooting. He changed that, however, and admitted he got into the truck before it drove away. As they were driving away, Goofy said, "I taught that fool a lesson." Defendant said he got dropped off, he called Jared and Michael, and they picked him up and took him home. Defendant never saw Goofy again.

Defendant said he was jumped into the Brown Demons when he was 14 years old, and he had been in the gang for approximately four years, but was finished with the gang and intended to move to Nevada with his mother. Condon showed defendant the police department's gang book containing photographs of Brown Demons gang members. Defendant did not identify anyone in the book as Goofy, Bandit, or Vandal.

Two to four months after the shooting, Condon saw Youngster, who Condon said was about five feet six inches to five feet eight inches tall and weighed 185 or 190 pounds. Condon described Youngster as stocky.

Sean Enloe performed the autopsy on Sarmiento. Sarmiento died due to a gunshot wound to the head. The bullet entered next to Sarmiento's right eye and came to rest at the rear of the left side of his brain. Enloe estimated the shot was fired from closer than 18 inches.

A firearm examiner for the Orange County Sheriff's Crime Laboratory examined the bullet extracted from Sarmiento's body. It was a .45-caliber made to be fired from an automatic firearm, but there are a couple of manufactures (Smith and Wesson, Ruger) who make a .45-caliber bullet for revolvers. Marks on the bullet

13

indicated it was fired from a revolver, rather than an automatic weapon. Police never found the suspected murder weapon.

Ryan Killeen, a gang investigator with the Anaheim Police Department, testified as a gang expert. He gave the jury the definition of a criminal street gang, explained the importance of respect in the gang culture, what claiming a gang means, what backing up a gang means, the meaning of graffiti to gangs, the importance of guns to gangs, and explained the meaning of a "hit up." A hit up occurs when a member from one gang asks an individual from a rival gang, where he is from. If a person is hit up, the person is expected to claim his gang. Killeen said a "jump in" is a means of accepting someone into the gang. The person who wants to join the gang is physically assaulted by other gang members for a predetermined period of time, after which the person is considered one of the gang.

Killeen stated a gang member in possession of a gun is expected to notify other gang members of his possession. He also explained how certain crimes can benefit the gang.

Killeen is familiar with the Brown Demons. The Brown Demons' territory includes the area around Euclid Avenue and Ball Road. He testified to two predicate offenses to establish the Brown Demons' pattern of criminal activity. He said the Brown Demons' primary activity includes felony gun possession and vandalism. Varrio Norwalk was a rival of the Brown Demons.

Killeen is familiar with defendant, although Killeen has never met him. He reviewed defendant's background, including the fact that defendant's moniker is "Casper." Defendant admitted being a member of the Brown Demons on a number of occasions. Killeen opined that defendant and Martinez were active gang participants and members of the Brown Demons on the date of the shooting. He further opined that Youngster is Juan Carlos Barajas, a member and active participant in the Brown Demons

14

gang on the date of the shooting. In Killeen's opinion, Sarmiento was a member of the Varrio Norwalk gang.

*Defense Evidence*

Defendant's mother and his aunt testified defendant is right handed. Defendant's mother confirmed that she and defendant planned to relocate to Las Vegas. She left ahead of him and he remained with relatives. He was supposed to join her in Las Vegas the weekend after he was arrested.

Defendant's mother said defendant was short when he was growing up. At the time of the shooting, defendant was five feet four inches tall. His mother is five feet one inch tall. He is taller now. The parties stipulated defendant was five feet five and one-half inches tall without shoes and five feet six inches tall with shoes on December 18, 2013. Defendant's aunt said defendant was two to three inches taller at trial than he was in 2008.

Officer Trang Pham stopped Martinez for a bicycle violation in 2007. Pham recognized Martinez because he had previously arrested Martinez for vandalism. When Pham asked Martinez if he was still a member of the Brown Demons, Martinez said he hung out with them and backed them up. He said he would do so until the day he died. Martinez said his moniker was Clever and he was going to put in work for the gang so he could get tattoos. When Pham asked Martinez what kind of work he needed to put in, Martinez lifted his left hand into the shape of a gun and said, "Tack, tack, tack." Pham then asked what work Martinez had already put in for the gang. Martinez again raised his left hand and "made a stabbing motion." Pham asked what Martinez meant by that, and Martinez said he stabbed someone next to that person's lung with a six-inch blade, in the area of Magnolia and Commonwealth in January 2007, during the "killing season."

15

Pham gave Martinez a warning citation for the bicycle violation and, as Martinez road away, he called out, "Remember Ball and Dale." To Pham, that meant remember the Brown Demons, because Ball and Dale was the Brown Demons main area of activity at the time.

Officer Matthew Ellis interviewed Flores at the scene, within a half an hour of the shooting. Flores told him the shooter was left handed. He said the right front passenger of the vehicle was a male Hispanic, 17 years old, about 200 pounds, black shaved hair, and wearing a black T-shirt, black baseball hat, and jeans. He described the right rear passenger as a 17 or 18-year-old male Hispanic, five feet 10 inches tall, 230 pounds, wearing a gray sweater, a white shirt, and a black hat with an orange bill and an orange "F" on the hat.

Defendant testified in his own defense. On the night of the shooting, he was with Louie, Youngster, whose real name is Juan Carlos Barajas, and Vandal, who defendant knows as Felipe. They picked up Martinez. After going to Louie's house for "some weed," they headed toward a liquor store off of Katella Avenue and Euclid Avenue. They never got there because while they were driving on Euclid in the "burgundy-ish" SUV, they saw some people on the other side of the street and Barajas told the driver to make a U-turn. Then Vandal yelled out "Brown Demons." Vandal made a U-turn northbound and stopped in the middle of the street. Defendant said he, Barajas and Martinez got out of the vehicle. Barajas was the first person out, followed by defendant and Martinez. There had been no discussion about having a confrontation.

When he got out of the car, defendant noticed Barajas had a bat. Thinking Barajas might do something impulsive because he had been drinking, defendant elbowed Barajas and tried to push him away from the people closest to the sidewalk. Prior to defendant pushing Barajas away from Sarmiento, Barajas yelled, "Brown Demons." Defendant told him to relax. Martinez asked, "Hay pedos?" Defendant, who does not speak Spanish, did not know what it meant.

16

Defendant saw Sarmiento. He knew Sarmiento, having "kicked it with him," i.e., "h[u]ng out" together. Seeing Sarmiento, defendant did not think there would be a confrontation. Sarmiento stepped into the street and "threw up the 'N.'" After Sarmiento saw defendant, Sarmiento raised his hand to his brother Adrian, as if to wave off Adrian, who was far away and running toward Sarmiento. Adrian stopped running.

Martinez shot Sarmiento. Defendant did not see Martinez fire the fatal shot, but he saw Martinez standing in front of Sarmiento after he heard the shot. He also saw Barajas hit Sarmiento in the back with a baseball bat as Sarmiento fell. Defendant did not understand why Barajas would hit Sarmiento after Sarmiento was shot. Once the shots were fired, defendant and the others returned to the vehicle. While driving away, Martinez said, "I taught that fool a lesson."

Defendant admitted a 2008 conviction for committing a felony in association with the Brown Demons. He said he was planning to get out of the gang and move to Las Vegas before the shooting.

## II

## DISCUSSION

A. *Natural and Probable Consequences Instruction*

Defendant was prosecuted for first degree murder on three different theories and the court instructed the jury on each of the theories: 1. That he was the shooter and deliberated and premeditated the killing of Sarmiento; 2. That he was not the killer, but he aided and abetted the killer and shared the killer's intent; and 3. He aided and abetted the killer without sharing the killer's intent, but a first degree murder was a natural and probable consequence of the lesser crime defendant aided and abetted. In connection with the natural and probable consequences theory, the trial court instructed the jury that to convict defendant of murder, the prosecution must prove defendant violated section 415, subdivision (1) (fighting in public or challenging to fight in public); during the violation of section 415, a co-participant committed a murder; and a

17

reasonable person would have known murder was a natural and probable consequence of fighting or challenging someone to fight. (CALCRIM No. 403.)

After the trial, our Supreme Court held the natural and probable consequences theory of aider and abettor liability cannot serve as a basis of a conviction for first degree murder. (*People v. Chiu*, *supra*, 59 Cal.4th at p. 167.) Consequently, instructing the jury on the natural and probable consequences theory in this matter was error. The issue now is whether such error requires reversal in this matter.

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on the valid ground. [Citations.]" (*People v. Chiu*, *supra*, 59 Cal.4th at p. 167.) Because the defendant in *Chiu* was prosecuted on a direct aiding and abetting theory—the permissible theory—and as an aider and abettor under the natural and probable consequences theory—the legally impermissible theory— (*Id*. at p. 158), and the court could not "conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory," reversal was required. (*Id*. at p. 167.) An instruction that relieves the prosecution of the obligation to establish a necessary element violates a defendant's right to due process under the state and federal Constitutions, and is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 (reversible unless harmless beyond a reasonable doubt). (*People v. Cox* (2000) 23 Cal.4th 665, 676-677.)

Whether such instructional error requires reversal or was harmless requires an appellate court to closely examine the record to determine whether it may conclude beyond a reasonable doubt that the error did not contribute to the jury's verdict. The Attorney General argues the error was harmless because the jury convicted defendant of first degree murder "based on a different, valid theory of liability." According to the Attorney General, because the jury also found the special circumstance allegation true and the instruction on the special circumstance required the jury to find the defendant

18

"intentionally killed" Sarmiento, defendant was not prejudiced by the erroneous instruction. We note, however, that the special circumstance's requirement that the defendant intentionally killed the victim while a member of a criminal street gang does not require the defendant to have been the actual killer. (§ 190.2, subd. (c).)

It is possible in a given case to conclude the giving of an erroneous natural and probable consequences instruction was harmless beyond a reasonable doubt when the jury finds the defendant guilty of first degree murder *and* finds the gang special circumstance true, because the special circumstance required finding the defendant intentionally killed. In such a situation, it might be concluded the jury necessarily rejected the natural and probable consequences theory of aider and abettor liability and instead found defendant was either the actual killer or aided and abetted the actual killer while sharing the killer's intent to kill. We are, however, unable to do so in this matter.

The jury informed the court at 4:15 p.m. on January 2, 2014, that it reached a verdict, but requested the verdict be taken the next day at 1:30 p.m. Earlier in the day, the jury sent notes to the court seeking further instruction on natural and probable consequences. About a half an hour after the court gave the jury a response to its request for clarification on the issue of natural and probable consequences, the jury sent out a note stating the jury was unable to reach a verdict. That note had not been dated and signed by the foreperson. The jury took its lunch recess after submitting the note stating it was deadlocked. When the jury returned from lunch, the bailiff returned the note for the foreperson to date and sign, but the jury informed the bailiff it was continuing in its deliberations. A verdict was reached less than three hours later. The fact that the jury requested further instruction on natural and probable consequences late in its deliberations leads to a reasonable inference there were not 12 votes for guilty on the charge of first degree murder based on theories the defendant was the shooter or shared the shooter's intent and aided and abetted the shooter. If there had been agreement, there would have been no reason to request further instruction on a third, unnecessary theory of

19

murder. The fact that the jury reached a verdict shortly after it received further instruction on the issue of natural and probable consequences tends to indicate one or more jurors voted guilty based on the natural and probable consequences theory. Because the jury was instructed its members need not agree on the theory of guilt, defendant could have been found guilty with one or more jurors finding liability on an improper theory.

Although the evidence was more than sufficient to sustain the verdict had a sufficiency of evidence challenge been mounted, the evidence was not overwhelming. Only one witness, Martinez, a witness who took a plea bargain with a six-year sentence in an effort to avoid the possibility to life imprisonment on this case, testified to the identity of defendant as the shooter. And there was evidence from which the jury could have found Martinez was the shooter. Defendant testified Martinez was the shooter; Martinez was present at the shooting; prior to the crime, Martinez told a police officer he needed to put in work for the gang and that work was shooting; shortly after the shooting, an eyewitness told police the shooter was left handed; defendant is right handed; and Martinez is left handed.

Additionally, although all the evidence indicated there was but one gun and one shooter, the jury not only found defendant personally used a firearm and personally discharged a firearm causing death or great bodily injury, it also found defendant was *not* the shooter, and that another principal shot Sarmiento. (§ 12022.53, subd. (e)(1).) Such a finding is only possible if the jury found defendant guilty on an aiding and abetting theory, including aiding and abetting based on the natural and probable consequences doctrine. Given these facts in this close case, we cannot find beyond a reasonable doubt the error in instructing on the natural and probable consequences theory of first degree murder liability was harmless. Moreover, irregularities in the taking of the verdicts (see *infra*) precludes finding this error was harmless.

20

B. *Counsel Not Informed of Proceedings with Jury and Verdict Forms*

Defendant contends the trial court violated section 1161 when, after receiving the signed not guilty of first degree murder form with the words "withdrawl [sic]" and "void" written across its face, the court supplied the jury with a clean not guilty form, and further instructed the jury. He argues the court's action amounted to an improper rejection of a not guilty verdict and not only requires reversal, but also dismissal of the charges. We disagree. The not guilty form marked "withdrawl [sic]" and "void" does not indicate the jury intended to acquit defendant of first degree murder. If that was the jury's intent, it would not have defaced the form indicating it was withdrawn and "void."

Late in the afternoon on January 2, 2014, the jury informed the court it reached a verdict, but that it preferred the court take the verdict the next day at 1:30 p.m. The bailiff obtained the verdict forms from the jury and gave them to the court to review "for completeness." The jurors were excused and ordered to return at 1:30 p.m. the next day. In reviewing the forms, the court observed the not guilty form for first degree murder had been signed and dated, but the signature and date had been crossed out and the words "withdrawl [sic]" and "void" had been written in large letters diagonally across the form. Without consulting with counsel, or even making counsel aware of the situation, the court sent the jury a note when it reconvened on January 3, 2014, at 1:30 p.m. The note stated, "The 'Not Guilty' form for Murder in the First Degree had 'withdrawn void' handwritten across the form. The Court has taken out that form and replaced it with a clean copy." The note continued, apparently because the foreperson did not sign either of the verdict forms for count two, "As to Count 2, under tab # 2, please date and sign the appropriate form for the verdict you have reached or indicate to

21

the court by a question that you are unable to reach a verdict on Count 2 and are therefore deadlocked."

After sending the note to the jury, and after the jury informed the bailiff at 1:40 p.m., that it was ready with its verdicts, the court told counsel it had previously spotted "some areas of concern" with the verdicts and that it would provide counsel with the court's response to the jury and explain the situation *after* the verdicts are read.

Within minutes of the court informing counsel it had previously reviewed the verdict forms, the jury returned to the courtroom and verdicts were read. As stated above, the court read the guilty verdicts on both counts and the jury found all sentencing allegations true. The jury was polled and confirmed its verdict, although the jury was not polled on each finding individually. *After the jury was excused*, the court informed counsel of the specifics concerning the signed and dated withdrawn and "void" not guilty verdict form for first degree murder. Additionally, the court told counsel the jury had not signed either of the verdict forms for count two and that the court directed the foreperson to sign the appropriate verdict form or inform the court if the jury was unable to reach a verdict on that count. The court explained that the jury instructions directed the jury to inform the court if it makes a mistake on a verdict form, in which case the court would send in a new form, but the jury failed follow that instruction.

Defendant asserts the court's conduct amounted to requiring the jury to reconsider its previously rendered not guilty verdict, and that the matter must not only be reversed, but also dismissed. Section 1161 provides, in pertinent part: "When there is a verdict of conviction, in which it appears to the Court that the jury have mistaken the law, the Court may explain the reason for that opinion and direct the jury to reconsider their verdict, and if, after the reconsideration, they return the same verdict, it must be entered;

22

*but when there is a verdict of acquittal, the Court cannot require the jury to reconsider it.*" (Italics added.)  When a jury's verdict is received, the clerk is obligated to record the verdict in the minutes.  (§ 1164 ["[w]hen the verdict given is receivable by the court, the clerk shall record it in full upon the minutes"].)  "Once the jury has manifested its intention to acquit, then the court must receive and record the verdict.  [Citations.]  The court may not thereafter declare a mistrial without giving effect to that verdict." (*Bigelow v. Superior Court* (1989) 208 Cal.App.3d 1127, 1135.)  Indeed, when a mistrial is declared after the jury sufficiently demonstrated its intent to acquit, retrial is prohibited.  (*Ibid.*)

The procedural setting in *Bigelow* distinguishes that case from the present one.  In *Bigelow*, the jury found defendant not guilty of murder, but found the robbery special circumstance allegation true.  (*Bigelow v. Superior Court*, *supra*, 208 Cal.App.3d at pp. 1129-1130.)  The court refused to record the verdict and informed the jury they would need to deliberate further, that their verdict had not been recorded, and it would take time for the court and counsel to determine how to proceed.  (*Id.* at pp. 1130-1131.)  The court and counsel conferred for over a day.  The court eventually "gave the jury different verdict forms and sent them back to deliberate." (*Id.* at p. 1132.)  A day and a half after the jury had first given the court its verdicts, the jury sent the court a note asking if it could "'go with [its] original not guilty verdict.'" (*Ibid.*)  Shortly thereafter, the jury informed the court is was deadlocked and unable to reach a verdict.  The court then declared a mistrial.  (*Id.* at pp. 1132-1133.)  While a mistrial was declared in *Bigelow*, in the present case the court accepted the guilty verdict on the first degree murder charge and polled the jury—albeit not separately as to each finding—and confirmed the guilty verdict on the charge of first degree murder.

Defendant's argument is flawed. Giving the court a signed and dated not guilty verdict form with the words "withdrawl [sic]" and "void" scrawled across the form in large letters, while concurrently submitting a signed and dated guilty verdict form *on the same count* does not demonstrate an intent to acquit on that count. The jury's act of crossing out the date and signature and writing "withdrawl [sic]" and "void" in large letters across the face of the form negates the possibility of any such inference. Defendant has not attempted to explain why a jury that intended to acquit would defile the verdict form in that manner.

However, the trial court's act of "providing ex parte supplemental jury instructions to [the] deliberating jury" in this matter implicated defendant's "right to the assistance of counsel at a critical stage of the proceedings." (*People v. Bradford* (2007) 154 Cal.App.4th 1390, 1413, italics omitted.) It has long been the law in this state that the court "'should not entertain communications from the jury except in open court, with prior notification to counsel.' [Citation.] '"This rule is based on the precept that a defendant should be afforded an adequate opportunity to evaluate the propriety of a proposed judicial response in order to pose an objection or suggest a different reply more favorable to the defendant's case."' [Citations.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 384.) On the issue of communicating with the jury regarding the verdict forms, counsel may have been able to suggest instructions that would amplify, clarify, or modify the court's instruction to the jury. (*People v. Bradford*, *supra*, 154 Cal.App.4th at p. 1413.) Or, counsel could have taken some other action.

That the court's ex parte communication with the jury concerning the not guilty first degree murder verdict form did not occur as the result of an inquiry by the jury is a distinction without a legal difference. The rule is meant to protect the

24

defendant's interest when the judge communicates with the jury. The potential harm to a defendant is the same whether the court communicates ex parte with the jury concerning its verdicts or in response to a question.

While the court should have consulted with counsel prior to supplying the jury with a new, blank not guilty form and further instructing the jury by way of a note (see *People v. Bradford*, *supra*, 154 Cal.App.4th at p. 1413 [court's ex parte communication with jury "deprived [the defendant] of the opportunity for his attorney to have meaningful input into the court's responses"]), there is no need for us to determine whether this issue also requires reversal, given our decision to reverse the murder conviction on other grounds. We do, however, find that even were we to conclude the court erred in handling the issue the way it did, the withdrawn and "void" verdict form did not "manifest[ the jury's] intention to acquit" such that retrial would be prohibited under double jeopardy. (See *Bigelow v. Superior Court*, *supra*, 208 Cal.App.4th at p. 1135 [retrial prohibited where jury sufficiently showed "its intention to aquit"].)

That, however, was not the only issue with the taking of the verdicts. After the court entered the jury's guilty verdicts, explained its action in connection with the signed and dated first degree not guilty verdict form marked "withdrawl [sic]" and "void," and excused the jury, the court dropped a bombshell. The court stated there were two signed and dated verdict forms for first degree murder; one for guilty and one for not guilty.

The clerk's transcript contains a dated and signed not guilty form for first degree murder, in addition to the previous not guilty form with the date and signature crossed off and the large notation across its face. Apparently, the court decided the guilty verdict was the correct verdict; it characterized the second completed not guilty verdict

form as "another mistake" and never recorded the not guilty verdict, inquire of the jury about the not guilty verdict form, or send the jury back into deliberations to resolve the irreconcilable conflict in the verdicts on count one.

In *People v. Carbajal* (2013) 56 Cal.4th 521, the defendant was charged with a number of sex offenses involving three different victims. The jury found defendant guilty on three counts involving the same victim, was unable to reach a verdict on the counts involving the two other victims, and found the multiple victim allegation true. The trial court correctly observed that the finding on the multiple victim allegation was inconsistent with a verdict finding defendant guilty of sex offenses against but one victim. (*Id*. at p. 526.) The court advised the jury of the inconsistency and sent the jury back in to deliberate. The jury later indicated a desire to leave the multiple victim finding form blank. The court then took the guilty verdicts on the three counts involving the same victim and declared a mistrial as to the other counts and the multiple victim allegation. On appeal, the defendant argued double jeopardy prohibited retrying him on the multiple victim allegation. (*Id*. at p. 529.)

The Supreme Court described the procedures courts must follow in receiving a jury verdict, requirements set down by the Legislature "in prescriptive detail." (*People v. Carbajal*, *supra*, 56 Cal.4th at p. 530.) "Section 1147 provides that '[w]hen the jury have agreed upon their verdict, they must be conducted into court by the officer having them in charge.' Section 1149 provides that '[w]hen the jury appear they must be asked by the Court, or Clerk, whether they have agreed upon their verdict, and if the foreman answers in the affirmative, they must, on being required, declare the same.' Section 1161, as noted, provides that '[w]hen there is a verdict of conviction, in which it appears to the Court that the jury have mistaken the law, the Court may explain the reason for that opinion and direct the jury to reconsider their verdict, and if, after the

26

reconsideration, they return the same verdict, it must be entered; but when there is a verdict of acquittal, the Court cannot require the jury to reconsider it.'  Section 1163 provides that '[w]hen a verdict is rendered, and before it is recorded, the jury may be polled, at the request of either party, in which case they must be severally asked whether it is their verdict, and if any one answer in the negative, the jury must be sent out for further deliberation.'  And section 1164, subdivision (a) provides that '[w]hen the verdict given is receivable by the court, the clerk shall record it in full upon the minutes, and if requested by any party shall read it to the jury, and inquire of them whether it is their verdict.  If any juror disagrees, the fact shall be entered upon the minutes and the jury again sent out; but if no disagreement is expressed, the verdict is complete . . . .'"  (*People v. Carbajal*, *supra*, 56 Cal.4th at pp. 530-531.)

The high court concluded the statutory provisions governing the procedure for taking a verdict "are intended to reduce the likelihood of a trial court unduly, even if inadvertently, influencing the jury to reach a particular outcome.  [Citations.]"  (*People v. Carbajal*, *supra*, 56 Cal.4th at p. 531.)  The Legislature decided "the risk of coercion outweighs the risk of jury error."  (*Ibid*.)

The *Carbajal* court stated, "Mere inconsistency does not provide a valid reason for courts to reject a jury verdict.  As the high court explained in *United States v. Powell* (1984) 469 U.S. 57 (*Powell*):  '[A]n individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake. . . .  But with few exceptions, [citations], once the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment.  Courts have always resisted inquiring into a jury's thought processes, [citations]; through this deference the jury brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality.'  [Citation.]  For this reason, our courts have consistently held that '[a]s a general rule, inherently inconsistent verdicts are allowed to

27

stand.' (*People v. Avila* (2006) 38 Cal.4th 491, 600; see *id.* at pp. 600–601 [discussing *Powell* with approval]; accord, [*People v.*] *Bigelow*, *supra*, 208 Cal.App.3d at p. 1136; [*People v.*] *Guerra* [(2009)] 176 Cal.App.4th [933,] 944; *People v. Espiritu* (2011) 199 Cal.App.4th 718, 727.)" (*People v. Carbajal*, *supra*, 56 Cal.App.4th at p. 532.)

In *People v. Avila*, *supra*, 38 Cal.4th 491, the Supreme Court explained the reason why inconsistent verdicts are permitted. "'"[I]f an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both.' [Citation.] Although '"error," in the sense that the jury has not followed the court's instructions, most certainly has occurred' in such situations, 'it is unclear whose ox has been gored.' [Citation.] It is possible that the jury arrived at an inconsistent conclusion through 'mistake, compromise, or lenity.' [Citation.] Thus, if a defendant is given the benefit of an acquittal on the count on which he was acquitted, 'it is neither irrational nor illogical' to require him to accept the burden of conviction on the count on which the jury convicted. [Citation.]" (*Id.* at p. 600.) Of course, that reasoning does not apply when the inconsistent verdict consists of a guilty and a not guilty verdict on the same count. Effect cannot be given to both. If the defendant is found not guilty, he cannot be punished for the acquitted offense. If he is found guilty he would, as occurred in this case, be sentenced to state prison.

While it is acceptable for a jury to render inconsistent verdicts involving counts or a count and a special allegation connected to that count, there is no recordable verdict when the jury purports to find the defendant guilty and not guilty on the same count, and the court does not get to pick the verdict to be entered based on its conclusion that that verdict is the correct one and the other was erroneously made. Moreover, it is evident in the present case whose ox was gored when the court unilaterally decided which verdict it was going to enter (the guilty verdict) on count one, while not even informing counsel of the existence of guilty and not guilty verdicts on the same count, namely the

28

defendant's.

When a jury states it has a verdict and submits signed and dated guilty and not guilty verdicts on the same count, the flaw is not merely one of inconsistency in the verdicts; the jury's verdict on that count is simply unintelligible. (See *People v. Carbajal*, *supra*, 56 Cal.4th at p. 532 [jury's verdict is unintelligible when it returns not guilty and guilty verdicts on the same count].) The court's decision to record the guilty verdict for first degree murder and to ignore the not guilty verdict rendered at the same time, rather than inform counsel of the problem, implicated defendant's right to counsel just as its decision to communicate with the jury about its verdicts without notifying counsel did. (See *People v. Garcia* (2005) 36 Cal.4th 777, 801-802 [court should notify counsel before answering a jury question or instructing on any point of law].) Had the court notified counsel of the contradictory and unintelligible verdicts (*People v. Carbajal*, *supra*, 56 Cal.4th at p. 532), rather than accepting the guilty verdict form and ignoring the not guilty verdict form, counsel could have guided the court to the proper response: informing the jury that it cannot find the defendant guilty and not guilty of the same first degree murder, that it must return to its deliberations and find the defendant guilty or not guilty, or announce that it is unable to reach a verdict on that charge. (See *People v. Keating* (1981) 118 Cal.App.3d 172, 181-182.) The court's action of privately selecting the guilty verdict form while ignoring the signed and dated not guilty form prejudiced defendant.

That the court polled the jury (collectively) about whether the guilty verdict form was its verdict did not cure the error. The jury was not asked about the signed and dated not guilty verdict form. Indeed, had the court alerted counsel to the existence of the not guilty verdict *prior to the jury being excused*, it is likely that polling the jury only in connection with the guilty verdict would have been met with an objection. Having concluded the court prejudicially erred, we must now decide whether retrial is prohibited as contended by defendant.

29

Contrary to the Attorney General's assertion, the failure to object in this matter did not forfeit the issue for appeal. First, the complained of acts on the court's part took place outside counsel's presence. Second, the court did not advise counsel of its actions until after it excused the jury. Third, the issue is an important one affecting defendant's substantial rights and we choose to address it regardless of whether there was a post-event objection or not. (*People v. Williams* (1998) 17 Cal.4th 148, 162, fn. 6.)

Defendant argues retrial is precluded because the court refused to accept the not guilty verdict and, as the jury returned a not guilty verdict on count one, he cannot be retried for that offense. He reasons that the jury manifested its intent to acquit and the court's refusal to enter the verdict violated sections 1164 and 1165.[3] We disagree. When a jury submits guilty and not guilty verdicts on the same count, it cannot be said that act is the equivalent of a verdict of acquittal. (*People v. Keating, supra*, 118 Cal.App.4th at p. 182.) Rather, the jury's intent is unintelligible. (*People v. Carbajal*, *supra*, 56 Cal.4th at p. 532.) Because the jury did not unequivocally indicate an intent to acquit, the prosecution is not precluded from retrying defendant on the murder charge.

---

[3] "Where a general verdict is rendered or a finding by the court is made in favor of the defendant, except on a plea of not guilty by reason of insanity, a judgment of acquittal must be forthwith given. If such judgment is given, or a judgment imposing a fine only, without imprisonment for nonpayment is given, and the defendant is not detained for any other legal cause, he must be discharged, if in custody, as soon as the judgment is given, except that where the acquittal is because of a variance between the pleading and the proof which may be obviated by a new accusatory pleading, the court may order his detention, to the end that a new accusatory pleading may be preferred, in the same manner and with like effect as provided in Section 1117." (§ 1165.)

### III

### DISPOSITION

The conviction on count one (first degree murder) and its attendant special allegations are reversed and the matter is remanded.  The judgment on count two is affirmed.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.