Filed 4/22/21  P. v. Brown CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G058533 |
| v. | (Super. Ct. No. 13NF1076) |
| TRAVIS JORDAN BROWN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Lynne G. McGinnis and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

\*　　　\*　　　\*

This case involves a gang murder. Defendant Travis Jordan Brown was initially found guilty of first degree murder and street terrorism, and in a prior opinion, we reversed the murder conviction and remanded for a new trial. On remand, defendant was convicted of first degree murder once again with a gang special circumstance. In this appeal, he argues the trial court abused its discretion by refusing his request to disclose juror information from the first trial. He also claims that without the testimony of his accomplice, there was insufficient evidence to connect him to the murder, and therefore, his motion to acquit should have been granted. We disagree with both contentions and therefore affirm the judgment.

I

FACTS

In 2013, defendant was initially charged with first degree murder (Pen. Code, § 187)[1] and street terrorism (§ 186.22, subd. (a)) as well as various sentence enhancements. He was found guilty of both counts and appealed from the conviction. (*People v. Brown* (2016) 247 Cal.App.4th 211 (*Brown I*).) In *Brown I,* we reversed defendant's first degree murder conviction because the trial court had instructed the jury on the natural and probable consequences doctrine as a basis for first degree murder. (See *People v. Chiu* (2014) 59 Cal.4th 155.) We also noted irregularities with the verdict form, but held they did not bar retrial. (*Brown I*, at pp. 228, 234.) Our reversal did not impact the street terrorism count. (*Id.* at p. 215.)

The following relevant testimony was adduced during the retrial.

---

[1] Subsequent statutory references are to the Penal Code.

2

*Erick Flores*

Flores was unavailable to testify at the second trial. His testimony from the first trial was read into the record, and we repeat our summary of it from *Brown I*, *supra*, 247 Cal.App.4th 211.

"Erick Flores was about 15 years old at the time of the shooting and was friends with Ivan Sarmiento. He knew Sarmiento about two years before the night of the shooting. That night, Flores was with his ex-girlfriend, Sarmiento, and Sarmiento's brother Adrian. Sarmiento had just been released from jail and Flores was 'catching up' with him. Sarmiento's girlfriend, Marissa, joined the group and when she needed to walk home, Flores offered to walk her home with Sarmiento. The three walked southbound on Euclid. When they got to a church, a red SUV [(sports utility vehicle)] passed them on the other side of the street. Flores' group 'pretty much locked eyes' with the people in the SUV. There were two people in the front seat and three in the backseat. Someone inside the vehicle yelled, 'What's up?' [A]nd the driver threw 'B' and 'D' gang hand signs out his window. Flores does not remember what the driver looked like, but he remembers telling a police officer the driver looked to be about 19 years old, had a mustache, and wore a baseball hat.

"When the SUV passed them, Sarmiento and Flores looked at each other and then back in the direction from which they had come. They saw Adrian about a quarter of a mile behind them.

"Flores knew Sarmiento to be a Varrio Norwalk gang member. Adrian was an associate of the gang, but not a member. Sarmiento's moniker was 'Little Brownie,' and Adrian's was 'Little Man.' Flores's moniker was 'Silent.' Flores was interested in joining a gang at that time, but the events of that night changed his mind.

"About 50 feet after passing Sarmiento, Marissa, and Flores, the SUV made a U-turn and drove back toward them on their side of the street. Sarmiento signaled Adrian to stay back. Sarmiento moved into the street. Marissa stayed back.

3

"The SUV stopped right next to Flores, Sarmiento, and Marissa. Someone from the SUV asked the group if they 'bang.' A passenger from the driver's side of the SUV got out, carrying a silver baseball bat, and screamed, 'Brown Demons.' The individual with the bat was about 18 or 19 years old, 'fat,' and wore a white T-shirt and a baseball hat. Flores said Sarmiento confronted the bat wielder.

"The right front passenger asked in Spanish if there was a problem, and got out of the SUV. Flores stepped up to the street. The front passenger was a male Hispanic, about 17 or 18 years old, light skinned, 'kind of tallish,' about five feet seven inches or five feet eight inches tall, 'skinny,' about 150 or 180 pounds, wore a baseball hat, and had a revolver. Flores does not remember whether the front passenger had a mustache. Flores said the right front passenger was about the same height as the male with the bat. According to Flores, only two people exited the vehicle. When Flores saw the gun, he backed up, tripped over the curb, and fell backwards. Prior to that, Flores glanced at Sarmiento and thought Sarmiento might have thrown an 'N' hand sign, but could not be sure.

"The male with the gun took a step forward, looked at Flores who had fallen, and then shot Sarmiento. Flores said the male shot Sarmiento once and a few seconds later, got closer, and then shot Sarmiento in the face. Flores does not remember telling an officer there were two shots. Neither does he remember telling an officer there was a quiet pop with a lot of smoke, and that the second shot was much louder. Flores said the first shot was from about 10 feet and the second was 'pointblank,' with the gun pointed at Sarmiento's face. The shooter held the gun in his right hand.

"According to Flores, the male with the bat was in front of Sarmiento when Sarmiento was shot in the face. Sarmiento fell to the ground face-first. Once he was on the ground, the male with the bat hit him in the back with the bat. The two assailants got back into the SUV and the vehicle drove off northbound. Flores turned Sarmiento over

4

and saw blood gushing from his eye. He waited with Sarmiento, holding Sarmiento's hand, and told people across the street to call for help.

"Flores had never seen the assailants before. He was later shown photographs by a detective and was unable to identify anyone as the shooter. Flores does not remember telling an officer the shooter shot with his left hand." (*Brown I*, *supra*, 247 Cal.App.4th at pp. 216-218.)

*Kevin Martinez*

At the time of the shooting, Martinez was 15 years old and "hanging out" with a gang called Southside Brown Demons (SBD). He was spending his days with defendant, who went by the moniker "Casper," and was about three years older than Martinez. Martinez had been associating with SBD since he was around 13 years old. He was "walked in" to the gang, rather than "jumped in," because of his brothers, who were also associated with the gang. To be jumped into the gang is to be beaten by its members. (*Brown I*, *supra*, 247 Cal.App.4th at p. 218.) Martinez had numerous juvenile convictions relating to his activity for the gang.

At the time of the shooting, Martinez had known defendant for about three years. They were best friends and hung out every day. They occasionally also hung out with a gang member whose moniker was "Youngster."[2] At that time, Martinez estimated there were 30 or fewer total members of SBD.

Martinez testified about SBD's practices and culture. SBD had a territory, or turf, in the area of Ball and Euclid in Anaheim. They had an ongoing conflict with the members of a gang known as Varrio Norwalk, whose members had begun painting in SBD territory. The concept of territory is important to gangs, and spray painting in another gang's territory is considered a sign of disrespect. Disrespect was dealt with by

_____

[2] Youngster was later identified as Juan Carlos Barajas.

violence. The presence of a rival gang member in a gang's territory was dealt with by "carry[ing] out violence to the person." Refusing to acknowledge one's own membership in a gang when asked by another gang member was considered disrespectful to one's gang and would subject one to retaliation. Members were also expected to support other members who became involved in violent altercations with rivals. Additionally, they were expected to "put in work" for their gang, which included spray painting walls, looking out for rivals in their territory, and "carry[ing] out violence to your enemy."

On the night of the shooting, July 11, 2008, Martinez and defendant were hanging out with Youngster and another gang member who went by the moniker "Vandal."[3] They eventually got into the SUV, which Martinez identified as a red Chevy Blazer, and drove toward Ball and Euclid. Vandal was driving, defendant was in the front passenger seat, and Youngster and Martinez were in the backseat. Martinez knew there was a bat in the car, possessed by Youngster, and that defendant had a gun. Martinez described the gun as a "big revolver," which he had seen in defendant's possession before.

While they were driving near the intersection of Ball and Euclid, those in the car saw three people walking on the sidewalk. Someone in the car yelled out "'Brown Demons.'" Someone said, "'There goes those guys from Norwalk,'" which Martinez understood to mean Varrio Norwalk. The SUV eventually stopped in the middle of the street, and Martinez and Youngster, taking the bat with him, exited the car. Vandal also got out of the car, leaving it running. The victim, Sarmiento, threw up his hands in a gang sign and approached them, coming into the street. They asked each other for gang affiliations and the victim claimed "Norwalk One Ways," which was a clique of Norwalk Varrio. Defendant then exited the car and tried to shoot the victim, but the gun did not fire until his third attempt, as defendant was walking toward the victim. The

---

[3] The police never identified Vandal.

6

victim was shot in the face. Martinez, defendant, and the other two SBD members returned to the car. After the shooting, Martinez and defendant continued to hang out every day until July 18, when they were arrested at defendant's residence. After the shooting, Martinez never saw defendant's revolver again and had no knowledge of what happened to it. The murder weapon was never located.

During his first interrogation by the police, Martinez denied any knowledge of the shooting. He eventually admitted these responses were dishonest. He was afraid that if he told the police who did the shooting, he would get hurt, based on his knowledge of the way gangs operate. At some point, he began telling the police the facts as reflected by his testimony. He changed his story with the police because the police were pressuring him and telling him that he could spend his life in prison, and he became afraid the police might know what had happened. He thought things would go better for him if he told the truth, but he understood that he was in trouble in any event. During that interview, he did not ask for any type of deal, talk to a prosecutor, or have a conversation with the officer about a possible deal.

Martinez eventually entered into a plea agreement in December 2010 in which he agreed to plead guilty to manslaughter and testify truthfully. He was sentenced to six years in December 2013. He subsequently had criminal convictions in 2014 for possession of marijuana for sale and transportation of marijuana in 2015 for vandalism, possessing a dagger, and evading police with "a gang aid count." He testified he eventually went back to the gang to see "if they wanted to do something to me" because he had testified.

*Samuel Oh*

On July 11, 2008, witness Samuel Oh was in a car in a church parking lot on Euclid Avenue, talking with two friends, one of whom was in a different car. The

windows of the cars were down as Oh spoke to his friends. It was dark due to the hour, but the street was "pretty well lit" due to streetlights.

From his vantage point in the parking lot, he saw a red SUV stop in the middle of the street. Three or four men whom Oh believed to be 18- to 20-year-old male Hispanics with shaved heads exit the SUV and approach three other men who had been walking down the sidewalk together. One of the men walking down the sidewalk was attacked by the men from the SUV. According to Oh, "He got beat up . . . then [he saw] a gun being pulled out, and he got shot." He described the shooter as wearing a "[r]ed jersey or some type of jersey," which he later testified was similar to a Pittsburgh Steelers jersey. Oh called 911.

*Investigation and Arrests*

The police arrived within a minute or two of Oh's call. Sarmiento was lying in the street, bleeding from a gunshot wound to his head. Sarmiento was transported to the hospital and pronounced dead. A later examination, revealed Sarmiento had been shot with a .45 caliber semiautomatic round fired from a revolver.

Flores was interviewed at the crime scene, and told the police what had occurred. He told the police one individual had wielded a bat and another, the front seat passenger, was the individual who shot Sarmiento with a black revolver. As noted above, Flores said the driver never left the car, and he described the shooter as about five feet eight inches tall and 200 pounds with a "heavy build." Later, Youngster's height and weight was ascertained as being approximately five feet six inches tall and 185-190 pounds, Martinez five feet seven inches tall and 115 pounds, and defendant five feet six inches tall and 180 pounds.

As mentioned before, defendant and Martinez were arrested on July 18. As noted *ante*, Martinez first denied his involvement and subsequently told the police what happened.

8

*Defendant's Versions of Events*

Defendant was also interviewed on the date of his arrest. He denied any involvement. In a second interview almost a year later, he denied being with any SBD members on the night of the murder, and claimed he was with other friends that night. He also denied any knowledge of conflicts with Varrio Norwalk and graffiti. During that interview, defendant admitted to knowing Sarmiento and stated he did not have any problems with him. He also started to relay a different version of events, claiming was he with "Goofy" and "Bandit" and a subject named "Louie." They were allegedly driving a different type of vehicle, a pickup truck with a shell. Defendant was unable to provide any details about Bandit or Louie (it was unclear if he was asked about Goofy). Defendant claimed he was sitting in the backseat with Bandit driving when someone said to make a U-turn. Goofy called out "'Southside Brown Demons.'" Defendant saw people walking on the street. After the U-turn, they stopped in the middle of the street. Goofy, according to defendant, got out of the car, followed by the rest of the occupants. They all confronted the victim, and defendant claimed Goofy shot the victim (or that he heard a loud boom or shot fired) and took off running. Defendant told the police he did not know that Goofy had a gun. When asked, defendant said that Martinez was not in the car. When confronted by Martinez's statement, defendant changed his story and said Martinez was in the car. When asked about running away, defendant stated that after running for a few minutes, he got back into the truck and drove away with his three purported companions. In the truck, Goofy allegedly stated something to the effect of "'I taught that fool a lesson.'" He claimed he never saw Goofy or Bandit again.

Defendant admitted to being an SBD member, claiming he was jumped in at the age of 14. While reviewing police photographs of SBD members, defendant was unable to identify anyone he had been with that night.

During his testimony in the first trial, defendant admitted that Bandit and Louie were not real people, and he claimed that Martinez was the shooter. Defendant

9

testified that when he got out of the car, he tried to stop the shooting, trying to push Youngster, who was holding the bat, away. He claimed the only reason he got out of the SUV was to de-escalate the situation. At trial, he claimed Vandal was driving, he was in the backseat with Youngster, and Martinez was in the front passenger seat.

During defendant's second trial, he testified again. He admitted he was an SBD member and gave a version of events somewhat consistent with the first trial. Unlike his previous statement to police, however, he now knew Sarmiento "real well" because he had lived in the area for years. He claimed any dispute between Sarmiento and SBD was between Sarmiento and an SBD member whose moniker was "Soldier." Again defendant testified that Youngster had hit Sarmiento with the bat and that he saw Martinez tuck a gun into his waistband after the shooting.

At the conclusion of the second trial, defendant was again convicted of first degree murder and a gang murder special circumstance was found true. The jury also found true allegations that defendant had committed the allegation for the benefit of a street gang (§ 186.22, subd. (b)), had personally used a firearm (§ 12022.5, subd. (a)), and defendant had intentionally and personally discharged a firearm, causing Sarmiento's death (§ 12022.53, subd. (d)). The jury found the allegation that another principal had discharged the firearm not true. (§ 12022.53, subds. (d)/(e).)

The trial court sentenced defendant to life without the possibility of parole and a consecutive 25 years to life term on the personal firearm discharge allegation. The court also imposed a consecutive 10-year term on the gang enhancement. A concurrent two-year sentence on the street terrorism count was stayed.

In this appeal, defendant argues the trial court abused its discretion by denying his request to disclose identifying information about the jurors who served in the first trial. He also claims the evidence at trial, without his accomplice Martinez's testimony, was insufficient to convict him, and therefore, his motion for acquittal should have been granted. We consider his arguments in turn.

10

II

DISCUSSION

*Juror Information*

Defendant first claims the trial court abused its discretion by finding a lack of good cause to unseal juror contact information from the first trial. After we reversed and remanded the matter, defendant's counsel filed a petition to unseal this information. The court ultimately denied the request.

To provide context for this request, we must review some of the facts we took note of in *Brown I*. At that time, unlike in the instant trial, the natural and probable consequences theory of first degree murder was available to the prosecution. As we stated: "During jury deliberations, the jury asked the court for further guidance on the natural and probable consequences theory of aiding and abetting liability. It wanted the phrase 'natural and probable consequence of the commission of fighting' clarified, and asked whether the court would 'clarify the difference between probable and possible.' That same day, the jury notified the court it was unable to reach a verdict. The form stating the jury was deadlocked was not signed or dated by the foreperson. When the form was returned to the jury for the foreperson to date and sign, the bailiff was informed the note was withdrawn and the jury was again deliberating.

"The jury then sent the following note to the court: 'Exhibit # 22--clarify if [Flores] was identifying the shooter or participant or what?' At 4:15 p.m. that afternoon, the jury informed the bailiff it had a verdict, but would prefer to return to court the next day to render its verdict. The bailiff retrieved the verdict forms for the court to review and the matter was continued to the next day. The court reviewed the verdict forms and saw the signed and dated not guilty verdict form on the murder count had 'withdrawl [sic]' and 'void' written across it in large letters. The court did not notify counsel of the irregularity. The next day when the case reconvened, without discussing the matter with counsel, the court sent a note to the jury stating: 'The "Not Guilty" form for Murder in

11

the First Degree had "withdrawal void" handwritten across the form. The Court has taken out that form and replaced it with a clean copy. [¶] As to Count 2, under tab # 2, please date and sign the appropriate form for the verdict you have reached or indicate to the court by a question that you are unable to reach a verdict on Count 2 and therefore deadlocked.' Approximately 10 minutes later, the jury notified the court it was ready with its verdicts." (*Brown I*, *supra*, 247 Cal.App.4th at p. 214.)

"After sending the note to the jury, and after the jury informed the bailiff at 1:40 p.m., that it was ready with its verdicts, the court told counsel it had previously spotted 'some areas of concern' with the verdicts and that it would provide counsel with the court's response to the jury and explain the situation *after* the verdicts were read.

"Within minutes of the court informing counsel it had previously reviewed the verdict forms, the jury returned to the courtroom and verdicts were read. As stated above, the court clerk read the guilty verdicts on both counts and the jury found all sentencing allegations true. The jury was polled and confirmed its verdict, although the jury was not polled on each finding individually. . . ." (*Brown I*, *supra*, 247 Cal.App.4th at p. 228.)

"Only after the jury had been excused did the court explain what had occurred the day before regarding the prior not guilty form. Then, in what must have been a surprise to counsel, the court stated it reviewed the verdict forms from that day, just prior to reading the verdicts in court, and saw the blank not guilty form the court had supplied to replace the previous not guilty form was also dated and signed. In other words, in submitting its verdicts that day, the guilty and not guilty verdicts on count one, first degree murder, had both been signed and dated. The court unilaterally, and without notifying counsel beforehand and without inquiring of the jury, determined the second not guilty verdict form was 'another mistake' and the correct verdict was guilty." (*Brown I*, *supra*, 247 Cal.App.4th at pp. 214-215.)

12

"Additionally, the court told counsel the jury had not signed either of the verdict forms for count two and that the court directed the foreperson to sign the appropriate verdict form or inform the court if the jury was unable to reach a verdict on that count.  The court explained that the jury instructions directed the jury to inform the court if it makes a mistake on a verdict form, in which case the court would send in a new form, but the jury failed to follow that instruction."  (*Brown I*, *supra*, 247 Cal.App.4th at p. 228.)

This is the context in which defendant requested the juror contact information before his second trial.  The defense, according to its motion, wished to ascertain "the intentions of the jury."  (Boldfacing & underlining omitted.)  The motion indicated three areas of concern:  the jury's apparent inability to follow instructions; the lack of counsel's involvement with respect to the "void" verdict form, which the defense claimed was not remedied by a poll of the jury; and the defendant's interest in seeking clarity, given that his "life and liberty" were at stake.  (Underlining omitted.)

We already concluded, in *Brown I*, that the court prejudicially erred in its handling of the verdict forms.  (*Brown I*, *supra*, 247 Cal.App.4th at p. 233.)  But we also concluded that retrial was not precluded "[b]ecause the jury did not unequivocally indicate an intent to acquit . . . ."  (*Id.* at p. 234.)

Requests for juror information are governed by Code of Civil Procedure sections 206, subdivision (g), and 237, subdivision (b).  After a trial, juror information is extracted or removed from the court record.  (Code Civ. Proc., § 237, subd. (a)(2)-(3).)  Code of Civil Procedure section 206, subdivision (g), states that a criminal defendant may only access such information when it is "necessary. . . for a . . . lawful purpose."  Code of Civil Procedure section 237, subdivision (b), establishes the relevant procedures:  "The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information.  The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie

13

showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure." We review the court's decision to grant or deny a motion to release juror information under the deferential abuse of discretion standard. (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 989-991.)

According to defendant, the reason for the request for juror information "was to investigate whether the jury (1) actually intended to vote not guilty on count 1, (2) actually intended to inform the court that there was a split among juror with respect to count 1, or (3) misunderstood the court's instructions," and if so, bring a motion to dismiss pursuant to section 1385.

The Attorney General argues this issue is barred by the doctrine of law of the case, which ""deals with the effect of the *first appellate decision* on the subsequent *retrial or appeal*: The decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case."" (*Leider v. Lewis* (2017) 2 Cal.5th 1121, 1127.) Our opinion in *Brown I* concluded that retrial was not precluded because the jury did not unequivocally indicate an intent to acquit; had we found otherwise, retrial would have been impermissible. (*Brown I*, *supra*, 247 Cal.App.4th at p. 234.) Thus, unsealing juror information to ask jurors about their intent (to the extent they remember exactly what happened at a trial over six years ago), was irrelevant to the second trial. The defense contends their intent was a possible motion to dismiss pursuant to section 1385, if the jury indicated its intent was to acquit, but the connection between what some jurors *might* recall and the likelihood of the court granting such a motion in a case of this gravity is beyond tenuous.

We find the prosecution has the better argument here. This court already found no intent to acquit based on the facts of the case: a verdict form that indicated a guilty verdict and a poll of the jury. Accordingly, the defense's intent seems to be to

14

revisit something this court has already decided – the jury's intent. The lack of intent to acquit is, indeed, the law of the case.

Further, even if it were not, the motion lacked good cause. The motion was not brought, for example, to find juror misconduct, but to learn what may have happened in a jury room years ago, including what the jury intended – which necessarily implicates what they were thinking. Without saying so, the defense was seeking insight into the jury's deliberative process – how did the two verdict forms come about? "'The mental processes of deliberating jurors are protected, because "[j]urors may be particularly reluctant to express themselves freely in the jury room if their mental processes are subject to immediate judicial scrutiny."'" (*People v. Nelson* (2016) 1 Cal.5th 513, 568-569.) The other justification offered, such as whether the jury correctly followed instructions, lacked the requisite good cause for disclosure. It is already clear they did not follow instructions as to the verdict form, but this offers no grounds for a dismissal, nor could it reasonably do so. We find no abuse of discretion.

*Motion for Acquittal*

Defendant next contends the court erred by denying his motion to acquit pursuant to section 1118.1, which he made at the close of the prosecution's case. He claims that other than Martinez's testimony, there was no corroborating evidence that he was "the shooter."

Section 1111 "prohibits a defendant from being convicted on the uncorroborated testimony of an accomplice." *(People v. Williams* (2008) 43 Cal.4th 584, 635-636.) Accordingly, section 1118.1 permits defendants, at the close of either side's evidence, to seek an order of acquittal from the court when "the evidence then before the court is insufficient to sustain a conviction" on appeal.

We "review[] the denial of a section 1118.1 motion under the standard employed in reviewing the sufficiency of the evidence to support a conviction." (*People*

*v. Houston* (2012) 54 Cal.4th 1186, 1215.) When the section 1181.1 motion is made at the close of the prosecution's case, we consider the record as it existed at that point. (*People v. Smith* (1998) 64 Cal.App.4th 1458, 1464.)

Under the substantial evidence standard, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We "presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*Ibid.*) The same standard applies to cases in which the prosecution relies primarily on circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.) We must also accept logical inferences that might be drawn from the circumstantial evidence. (*Ibid.*)

To determine whether sufficient corroboration exists absent the accomplice testimony, we eliminate the accomplice's testimony and apply the substantial evidence test to the remaining evidence. The corroborating evidence is not required to establish, despite defendant's argument to the contrary, that he was "the shooter." The corroborating evidence must connect the defendant to the crime, rather than to his accomplice. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32-33.) "The evidence 'need not independently establish the identity of the victim's assailant' [citation], nor corroborate every fact to which the accomplice testifies [citation], and '"may be circumstantial or slight and entitled to little consideration when standing alone"' [citation]. 'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.'" (*Ibid.*)

16

What evidence connects defendant to the murder? While we cannot consider his testimony in this case, because his motion was made at the close of the prosecution's case-in-chief, we can consider other statements that he has made. "A defendant's own conduct or statements may provide adequate corroboration for accomplice testimony. [Citations.] 'False and contradictory statements of a defendant in relation to the charge are themselves corroborative evidence.'" (*People v. Jones* (2018) 26 Cal.App.5th 420, 439-440.)

Defendant admitted to being an SBD gang member. In his second interview with police, he gave an account of the murder consistent with his presence at the scene, but gave admittedly false names of fellow gang members. Once confronted with the fact that Martinez admitted his presence to the police, defendant again changed his story, stating Martinez was both present and the shooter.

This was at least defendant's fourth version of events. His first version was a complete denial of any knowledge of events. His second was a previously undisclosed alibi that claimed he was with other friends. The third version was the fictional Louie, Goofy, and Bandit story. The fourth version placed Martinez as the shooter. Various other details also shifted, such as knowing who Sarmiento was. Nonetheless, the final version he told police and repeated at the first trial placed him squarely at the scene. His own version of events included his flight from the scene, indicating consciousness of guilt. (*People v. Garrison* (1989) 47 Cal.3d 746, 773.)

The final version, where he admitted his presence at the scene and knowing the victim, is largely consistent with the testimony of Flores and Oh, with the noted addition that he shifted all the blame from himself onto others. Flores's testimony also provided additional corroboration and weighed against defendant's story that Martinez was the shooter. Flores initially described the shooter as approximately five feet eight

17

inches tall and 200 pounds with a "heavy build."[4]  Defendant was approximately five feet

six inches tall and 180 pounds, while Martinez weighed only 115 pounds.  While an

estimate two inches and 20 pounds off was within the scope of reason, the likelihood of

Flores mistaking defendant and Martinez at close range, or referring to the 115 pound

Martinez as being 150-180 pounds, as he later testified, was exceedingly unlikely and

provided additional corroboration of Martinez's version of events.

Admittedly, Flores's identification was not a perfect match, as eyewitness

testimony so often fails to be.  Nonetheless, it provides corroboration from which a

reasonable finder of fact could connect defendant to the crime.  Overall, however, it is

defendant's own multiple versions of events that are the most salient testimony against

him.  After an initial denial and false alibi, his "final" version of the story admits his

presence at and his flight from the crime scene, as well as his attempt to implicate the one

witness who has consistently identified him as the shooter.  His own statements provide

independent evidence that connected him with the crime.  Accordingly, we find the

evidence sufficient, and the section 1118.1 motion was properly denied.

---

[4] Flores testified at the first trial he did not recall stating this, but estimated the shooter's weight at 150-180 pounds, which he referred to as "skinny."  Flores's initial statement and his later testimony at trial also conflicted as to whether the shooter was left or right handed.

18

III

DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.