Filed 7/25/24  P. v. Olague CA3
Opinion following transfer from Supreme Court

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

|  |  |
|---|---|
| THE PEOPLE, | C092670 |
| Plaintiff and Respondent, | (Super. Ct. No. CR20035627) |
| v. | OPINION ON TRANSFER |
| JAMES JOSEPH OLAGUE, |  |
| Defendant and Appellant. |  |

In May 2006, a jury found defendant James Joseph Olague and two codefendants, Ernesto Duran Arrellano and Oscar Hurtado Cervantes, guilty of the "first-degree murder (Pen. Code, § 187; undesignated statutory references are to the Penal Code) of Robert Stepper and Eric Folsom, and attempted murder of Vicki Folsom and Jessica Valdez on Halloween 2002."  (*People v. Olague et al.* (Apr. 7, 2009, C053372) [nonpub. opn.] (*Olague*).)  The jury also found true enhancements that these crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(4)) and a principal personally

1

discharged a firearm causing death or bodily injury (§ 12022.53, subd. (a)), as well as the special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)) and intentional killings as participants in a criminal street gang (§ 190.2, subd. (a)(22)). (*Olague, supra,* C053372.) We affirmed defendant's convictions, enhancements, and special circumstance findings in an unpublished decision issued April 7, 2009. (*Ibid.*)

Defendant petitioned the trial court for resentencing based on the elimination of the natural and probable consequences doctrine under Senate Bill No. 1437 (Reg. Sess. 2017-2018) (Stats. 2018, ch. 1015, § 4, eff. Jan. 1, 2019) (Senate Bill 1437). Following the appointment of counsel, extensive briefing, and a hearing, the trial court denied defendant's petition in a written ruling. The court explained that the jury had been instructed that to find the special circumstances true, they had to determine, as to each defendant, that "he acted with the intent to kill, either as the actual killer or as a direct aider and abettor or co-conspirator who with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer." Accordingly, when the jury found the special circumstances were true, the jury determined defendant had an "actual intent to kill," thus "making [defendant] ineligible for relief under the resentencing statute."

Defendant appealed contending his resentencing petition and associated filings "raised a reasonable doubt that the jury found" he had "intended to kill," thus requiring the trial court to issue an order to show cause. We disagreed with defendant's arguments in an unpublished opinion issued January 24, 2022. Nonetheless, because of legislative changes occurring following the close of briefing, we ordered the matter remanded to allow the trial court to determine whether defendant could demonstrate a prima facie case for relief as to his attempted murder convictions. We otherwise affirmed the trial court's order.

Defendant petitioned the California Supreme Court for review, and on April 24, 2024, the Supreme Court transferred the case back to us with directions to vacate our

2

previous decision and reconsidered the matter in light of *People v. Curiel* (2023) 15 Cal.5th 433 (*Curiel*).  Having done so, we conclude the jury instructions and associated findings preclude defendant from making a prima facie case for relief as to his two murder convictions.  The briefing on transfer has not addressed defendant's two attempted murder convictions, and we accept the parties' previous concession that remand is required as to the two attempted murder convictions to allow the trial court to determine whether defendant can state a prima facie case for relief under amended section 1172.6 relevant to these convictions.  We will otherwise affirm.

## I.  BACKGROUND

A.      *The Underlying First Degree Murder and Attempted Murder Convictions*

We take certain facts and procedural history from the unpublished opinion we issued in 2009 affirming defendant's convictions in *Olague, supra,* C053372:

"On September 21, 2003, an indictment was filed alleging that defendants and others—Christina Marie Marten, Nathaniel Easlon, Richard Betancourt, and (later added) Gilberto Lopez—committed the following crimes:

"Count 1:  First-degree murder of Robert Stepper (§ 187, subd. (a)), with enhancements alleging the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(4)), Cervantes used a firearm which caused death or bodily injury (§ 12022.53, subds. (a), (d)), and a principal personally discharged a firearm causing death or bodily injury (§ 12022.53, subd. (a)).  Count 2:  First-degree murder of Eric Folsom, with enhancements as above.  Count 3:  Attempted murder of Vicki Folsom (§§ 187, subd. (a); 664, subd. (a)), with enhancements as above.  Count 4:  Attempted murder of Jessica Valdez, with enhancements as above.

"The indictment also alleged special circumstances for multiple murder and intentional killings as participants in a criminal street gang (§ 190.2, subds. (a)(3), (a)(22)[]).  The prosecutor sought the death penalty against Arellano and Cervantes only, not against Olague.

3

"At trial, the prosecution presented evidence supporting its theory that, although the Norteño and Sureño gangs were rivals, their members cooperated in committing these crimes because Arellano (a Norteño leader or 'shot caller') and nonparty Candelario Garza (a Sureño leader) cooperated in the sale of drugs in Woodland. Arellano (a Norteño) ordered the hit because victim Stepper (a Norteño) owed him money for drugs, and Arellano wanted to send a message to others who owed money and re-instill fear in the community. Christina Marten (a Norteño) brought Stepper to the place of attack. The shooter was Cervantes, who was not a gang member but who associated with Norteños, Sureños, and Crips. Stepper was the target, and the other victims were shot either because they were in the 'kill zone' or because Cervantes intentionally shot them in an attempt to eliminate witnesses. Easlon (a Crips gang member) acted as lookout. Arellano's neighbor, Gilberto Lopez (a Sureño), was the getaway driver. Olague (a Sureño) was on the street at the time of the shooting to ensure that all participants did what they were supposed to do.

"Evidence adduced at trial included the following:

"Easlon and Betancourt (Norteño) testified about a gathering at Arellano's apartment before Halloween 2002. Arellano asked Easlon and Betancourt to 'fuck up' (beat up) Robert Stepper, who owed Arellano about $500 to $800 and was not doing what he was supposed to be doing to help the drug trade. Easlon (who owed Arellano [$1],600 for drugs) and Betancourt refused to do the actual deed, because Stepper was their friend. Arellano asked Cervantes, who was also there, to 'handle it.' Cervantes agreed and was given some drugs. Easlon, to pay off his debt, agreed to Arellano's request to station himself at the end of the street on Halloween and 'make sure nobody we know goes down that street . . . .' Lopez came to the door and was told by Arellano, '[i]t's going to go down,' and Lopez was needed as the getaway driver. (Though Lopez had a 'beef' with Cervantes, who impregnated Lopez's girlfriend, there was evidence that Lopez did not know Cervantes would be involved.) Arellano took a phone call, then said 'Jaime' and

4

Garza were on the way over with the gun and told Easlon and Betancourt to leave. Easlon testified he knows three 'Jaimes,' one of which is Olague. Easlon did not stay and therefore did not know if it was Olague who showed up. However, Easlon testified it was Olague who showed up when the crime took place.

"On Halloween, around 10:00 p.m., as planned, Easlon concealed himself at the end of Oak Avenue to stand watch. Marten walked Stepper down Oak Avenue and then left. Stepper began chatting with the other victims near a pickup truck in victim Valdez's driveway. Olague, whose job was to make sure others did their job, walked Cervantes partway down the street.

"As related by the surviving victims, a man approached the victims, 'kind of' grinned, pulled out a gun, aimed the gun at Stepper's head, and fired from a distance of two feet (killing Stepper). The shooter then pointed the gun at the others and fired multiple times (killing 17-year-old Eric Folsom and injuring 14-year-olds Vicki Folsom and Jessica Valdez). At trial, one of the survivors identified Cervantes as the shooter, though she had not identified him [in] a photo lineup.

"As Lopez drove the getaway car, Cervantes hit the dashboard and said, 'I got 'em, I got 'em.' Lopez had not expected any shooting. He later told Garza that Veronica Lugo (girlfriend of Guillermo Ramirez, who had been with Lopez) was in an alley and heard the gunshots. Lugo testified she was summoned to an apartment the next day where several people, including Cervantes and Olague, were present. Garza, Lopez, and Ramirez led her into a bedroom and told her to keep her mouth shut or she and her children would be killed.

"An expert in criminal gangs, Sergeant Steven Gill, said rival gangs do work together in drug activity and will commit a crime such as murder together to further their criminal enterprise, enhance both gangs' reputations, and further instill fear and intimidation in the community and other gang members. A non-gang member's participation would be a way to be accepted by the gangs.

5

"All three defendants testified at trial and denied any involvement. Arellano (age 34 at trial) said he was a Norteño for 10 years but was not a shot caller. He denied any pre-Halloween meeting, denied ordering or suggesting that anyone kill Stepper, and said he did not even know Cervantes or Olague before Halloween 2002, except for an incident where he almost got into a fight with Olague (whom he pegged as a Sureño). Arellano admitted that on one occasion he told Cervantes to 'handle it' but testified he was telling Cervantes to go get a pipe to smoke drugs. Stepper was Arellano's friend, did not buy drugs from him, and did not owe him money. On Halloween, Arellano was on his way home, saw Stepper, said hello, and noticed a car full of people wearing blue (a Sureño color). Arellano said his only prior crimes were spousal abuse, selling drugs, and participating in a prison riot in which he was just following gang orders, though he was in front of his cohorts.

"Cervantes (age 28 at trial) testified he has never belonged to a gang, though he knew gang members. He knew Olague before Halloween, but not Arellano. When arrested, Cervantes said he 'knew this day was coming,' but he thought he was being arrested for violating probation. Cervantes denied telling his cellmate . . . about the case and denied tampering with his handcuffs (evidence of which was adduced as an escape attempt). Cervantes had a prior felony conviction for selling drugs and a drug-related misdemeanor. Alibi witnesses testified Cervantes was with them that night.

"Olague (age 29 at trial) testified he was a gang member when he lived in Los Angeles (he equivocated on whether it was Sureño) and associated with 'southerners' when he moved to Woodland. He was friendly with Cervantes. Olague did not know or have any contact with Arellano, except Olague ran from a brief confrontation with Arellano as a member of a rival gang in a parking lot about a month before the crimes. Olague denied any involvement in the crimes. He came upon the crime scene after a friend dropped him off and he was walking to a friend's house. Olague admitted two prior felony convictions, for auto theft and verbally threatening his ex-wife.

6

"To advance the defense theory that the police pressured the accomplices to make false confessions consistent with the prosecution's theory, the defense hammered at inconsistencies in the accomplices' statements, and a defense expert testified about how police interrogations can elicit false confessions.

"In May 2006, the jury returned verdicts finding all three defendants guilty on all counts and finding true all enhancement allegations.

"In June 2006, the jury set the sentence for Arellano and Cervantes at life without the possibility of parole on the two counts of first degree murder.

"The trial court denied defense motions for new trial.

"On July 28, 2006, the trial court sentenced Arellano to prison for life without possibility of parole on Counts 1 and 2 (first degree murder). The court sentenced Arellano to nine years on Count 4 (attempted murder) and a consecutive term of two years, four months on Count 3 (attempted murder). The court imposed three 25-years-to-life terms for the section 12022.53, subdivisions (d) and (e), enhancements on Counts 1 through 3 and a 20-year term for the section 12022.53, subdivision (c), enhancement on Count 4.

"[¶] . . . [¶]

"Olague received the same sentence as Arellano, except Olague received the midterm sentence of seven years (rather than the upper term of nine years) for the Count 4 attempted murder." (*Olague, supra*, C053372, fns. omitted.)

On appeal, among other findings, we specifically upheld the substantiality of the evidence supporting the enhancement finding that all defendants had individually acted with the intent to kill Eric Folsom, as well as the denial of Olague's acquittal motion, which had argued insufficient evidence supported "that he knew Cervantes planned to kill Stepper and shoot the others." (*Olague, supra*, C053372.) In support of these conclusions, the prior opinion identified evidence establishing that the murder of any witnesses was part of the plan, which intended to "make a big statement to instill fear in

7

the community." (*Ibid.*) Defendants elected to do the shooting on Halloween, when people would be outside, and the shooter's act of seeing the witnesses with the intended victim and then shooting all victims at close range demonstrated express malice. (*Ibid.*) Further, Olague was implicated not only by accomplice testimony and his presence at the shooting. He also ran from the scene and threatened the jailhouse informant associated with the case. Substantial evidence supported the judgment against him. (*Ibid.*)

B.      *Defendant's Petition for Relief*

On April 4, 2019, defendant filed a pro per petition for relief under Senate Bill 1437 arguing he was eligible for resentencing because he was not the actual killer, did not with intent to kill aid and abet the actual killer, and was not a major participant who acted with reckless indifference to human life. Defendant alternatively argued he was entitled to relief under the California Supreme Court's decision in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), because it could not be established beyond a reasonable doubt that the jury had convicted him on a legally valid ground and that the trial court had failed to adequately instruct the jury with all elements necessary for a first-degree murder conviction.

On April 24, 2019, the trial court appointed counsel for defendant and transferred the matter so that it could be coordinated with the proceedings concerning an earlier petition filed by defendant's prior co-defendant Ernesto Arellano. Ultimately, the parties briefed whether defendant was precluded from making a prima facie showing by virtue of his gang special circumstance that had required the jury to determine that he aided and abetted with the intent to kill. Defendant's brief on this issue acknowledged: (1) he had been tried under alternate direct aider and abettor and natural and probable consequences theories, and (2) that the jury had found the special circumstance gang finding true, but nonetheless argued he was still eligible for resentencing. Defendant reasoned that post-judgment changes to the natural and probable consequences theory had eliminated first degree liability for that theory, and that in accordance with *People v. Brown* (2016)

8

247 Cal.App.4th 211 (*Brown*), the court could not use his gang special circumstance finding to conclude as a matter of law that he had been convicted of first degree murder on the direct aiding and abetting theory. Under *Brown*, the gang special circumstance was not dispositive, requiring the court consider "the totality of the circumstances" in light of the entire record to determine defendant's eligibility for resentencing. Defendant indicated the record would be further addressed in later prima facie briefing.

In contrast, the People argued, in pertinent part, that the gang special circumstance finding required the jury to determine that defendant had the intent to kill. Both CALJIC No. 8.80.1 (the generalized special circumstance instruction) and CALJIC No. 8.81.22 (the gang special circumstance instruction) required the jury to determine that defendant individually held an intent to kill. Because the jury found the gang special circumstance true, defendant was therefore prevented from establishing his prima facie eligibility for resentencing. *Brown* was distinguishable because of the unique circumstances of that case,[1] and even *Brown* acknowledged the possibility that a court could conclude any error in giving the natural and probable consequence instruction was harmless where a jury convicted a defendant of first degree murder with a true gang special circumstance finding. This was true, " 'because the special circumstance required finding the defendant intentionally killed. In such a situation, it might be concluded the jury necessarily rejected the natural and probable consequences theory of aider and abettor liability and instead found the defendant was either the actual killer or aided and abetted

---

[1] The *Brown* court was unable to conclude, in that matter, that the special circumstance was dispositive regarding the harmlessness of defendant's asserted error under *Chiu, supra*, 59 Cal.4th 155. Included among the reasons for this conclusion were irregularities concerning the taking of the verdicts (including the trial court's reading of a guilty verdict on the murder count, while ignoring an executed and dated not-guilty verdict on that count), as well as the jury's question shortly before verdicts were rendered concerning the natural and probable consequences doctrine, and the relatively weak case against Brown. (See *Brown, supra*, 247 Cal.App.4th at pp. 226-227, 232-233.)

9

the actual killer while sharing the killer's intent to kill.' " Further, and more fundamentally, the People argued that the court was not required to analyze whether it was *harmless error* to give the natural and probable consequence instruction. Rather, the court had to determine whether defendant had established that he could not now be convicted of murder. Given the prior direct aiding and abetting instruction and the special circumstance finding, defendant could not make this showing.

At the January 23, 2020 hearing, the court elected to defer ruling on the preclusive effect of the special circumstance finding. Thereafter, the parties engaged in further briefing and argument regarding the prima facie showing, including defendant's belated request for relief on the attempted murder counts. In the end, the court announced its decision to deny the petition at the September 1, 2020 hearing and then issued a written order concluding defendant had not made a prima facie showing that he was eligible for relief. Defendant was ineligible for relief by virtue of the jury's enhancement findings that had required a determination that "he acted with the intent to kill, either as the actual killer or as a direct aider and abettor or co-conspirator who with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer." *Brown* was distinguishable because of its unique facts.

Defendant timely appealed.

## II. DISCUSSION

### A. *Background*

Senate Bill 1437, which took effect on January 1, 2019, limited accomplice liability under the felony murder rule and eliminated the natural and probable consequences doctrine as it relates to murder, to ensure that a person's sentence is commensurate with his or her individual criminal culpability. (*People v. Gentile* (2020) 10 Cal.5th 830, 842-844 (*Gentile*).) As relevant to this appeal, natural and probable consequences and direct aiding and abetting were two different forms of aider and abettor liability. (*Chiu, supra*, 59 Cal.4th at p. 158; *People v. Chavez* (2018) 22 Cal.App.5th

10

663, 682-683.)  Under the natural and probable consequences doctrine, a person who knowingly aided and abetted a crime, the natural and probable consequence of which was murder, could be convicted of not only the target crime, but also of the resulting murder, irrespective of whether he or she harbored malice aforethought.  (*Gentile, supra*, at p. 845.)  In *Chiu*, the Supreme Court "held that the natural and probable consequences doctrine cannot support a conviction for first degree premeditated murder."  (*Ibid*; see *Chiu, supra,* at p. 167.)  Senate Bill 1437 went further, amending section 188 to now provide that "[e]xcept as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  (§ 188, subd. (a)(3); Stats. 2018, ch. 1015, § 2; *Gentile, supra*, at p. 846.)

The criminal liability of direct aiders and abettors did not change under Senate Bill 1437.  (*Gentile, supra*, 10 Cal.5th at p. 848; *People v. Offley* (2020) 48 Cal.App.5th 588, 595-596.)  Such persons who by act or advice aid, promote, encourage, or instigate the commission of murder, with knowledge of the direct perpetrator's criminal purpose and with intent to commit, encourage or facilitate the commission of murder, remain criminally liable for murder.  (*Offley, supra,* at pp. 595-596; see *Chiu, supra*, 59 Cal.4th at pp. 158, 161, 166-167.)

Senate Bill 1437 also added former section 1170.95 (now section 1172.6),[2] "which created a procedural mechanism 'for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief' where the two substantive changes described above affect a defendant's conviction."  (*Curiel, supra*, 15 Cal.5th at

---

[2] Effective June 30, 2022, the Legislature renumbered former section 1170.95 to section 1172.6.  (Stats. 2022, ch. 58, § 10.)  There were no substantive changes to the statute. Although defendant filed his petition under former section 1170.95, we cite to current section 1172.6 throughout the rest of this opinion.

p. 449.) The Legislature has since "amended the statute to expand the population of eligible offenders, codify certain aspects of [the Supreme Court's] decision in [*People v. Lewis* (2021) 11 Cal.5th 952 (*Lewis*)], and clarify the procedure and burden of proof at the evidentiary hearing stage of proceedings. (Stats. 2021, ch. 551, § 1.)" (*Ibid.*)

Section 1172.6, subdivisions (b) and (c) create a two-step process for evaluating a petitioner's eligibility for relief. (*Lewis, supra*, 11 Cal.5th at pp. 960-962.) First, the trial court must determine whether the petition is facially sufficient under section 1172.6, subdivision (b). (*Lewis, supra*, at p. 960.) If the petition is facially sufficient, the court follows section 1172.6, subdivision (c), appointing counsel (if requested) and following the briefing schedule set forth in the statute. (*Lewis, supra*, at p. 966.) Following the completion of this briefing, the court determines whether a petitioner has made a prima facie showing that he or she is entitled to relief. (*Ibid.*)

"While the trial court may look at the record of conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for section 117[2.6] relief, the prima facie inquiry under subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' [Citations.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citations.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Lewis, supra*, 11 Cal.5th at p. 971.)

We independently review the trial court's decision to deny a section 1172.6 petition for resentencing at the prima facie stage. (*People v. Harden* (2022) 81 Cal.App.5th 45, 52.)

*B.*     *The First Degree Murder Convictions*

Defendant contends the jury instructions and associated verdicts do not prevent him from making a prima facie case for relief.  First, defendant argues the jury instructions in his case did not actually require the jury find he had the intent to kill.  Second, he contends under *Curiel*, the jury's finding that he had an intent to kill is not enough to establish current liability for aider and abettor murder.  We find the record of conviction still affirmatively demonstrates defendant's ineligibility for relief as to his two murder convictions.

A trial court properly denies a section 1172.6 petition if the jury made a true finding on a special circumstance that renders the defendant ineligible for relief.  (See, *Curiel, supra*, 15 Cal.5th at p. 451.)  However, as our high court recently explained in *Curiel*, a finding of intent to kill alone is not enough to refute a defendant's allegations in a section 1172.6 petition.  (*Curiel*, *supra*, at p. 463.)  Rather, the jury's findings would only preclude a prima facie showing where those findings establish all elements necessary to "conclusively refute a petitioner's allegation that he or she could not be convicted of murder under current law." (*Ibid.*)

Relevant to the issues raised in this appeal, defendant's jury was instructed with CALJIC 8.80.1 on special circumstances generally.  This instruction provided in pertinent part:  "If you find a defendant in this case guilty of murder of the first degree, you must then determine as to that defendant, if one or more of the following special circumstances are true or not true . . . .  [¶]  . . . [¶]  If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor or co-conspirator, *you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree.*  [¶]  You must decide separately as to each of the defendants, the existence or

13

nonexistence of each special circumstance alleged in this case." (Italics added.) Thus, in order to find any of the special circumstances true, this instruction required the jury to find each defendant acted with the intent to kill when performing any of several listed actions (including aiding and abetting) "in the commission of the murder in the first degree." (CALJIC 8.80.1.)

The jury was also instructed with CALJIC 8.81.22, which provided in pertinent part: "To find that the special circumstance 'intentional killing by an active street gang member' . . . it must be proved: [¶] 1. A defendant intentionally killed the victim *or, with the intent to kill, aided or abetted in the killing*." Defendant's jury had also been instructed with CALJIC 3.01 on aiding and abetting generally, which explained: "A person aids and abets the commission or attempted commission of the crime when he: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime."

Thus, when read together, CALJIC Nos. 3.01, 8.80.1, and 8.81.22 show defendant cannot state a prima facie case for resentencing relief on his convictions to which the gang special circumstances applied. First, there is no question that defendant was not the actual killer; therefore, when the jury found the gang special circumstance (§ 190.2, subd. (a)(22)) true, it necessarily determined that "defendant . . . with the intent to kill, aided or abetted in the killing." (CALJIC No. 8.81.22; *Olague, supra*, C053372.) Moreover, the findings required to make this determination in light of CALJIC Nos. 3.01 and 8.80.1 show the jury necessarily found defendant aided and abetted a murder in the first degree, including the mens rea and actus reus necessary to aid and abet murder. (*Curiel, supra*, 15 Cal.5th at p. 463.)

Unlike *Curiel*, where the jury instructions on the special circumstance had no mention of aiding and abetting or other findings establishing that the jury determined all

14

elements necessary to find that the defendant was still guilty of aiding and abetting murder, (*Curiel, supra*, 15 Cal.5th at pp. 447, 462-471) here defendant's jury was instructed on aiding and abetting principles, and when read together, the jury necessarily found defendant aided and abetted a murder in the first degree when it found the gang special circumstance true. (CALJIC Nos. 3.01, 8.80.1, and 8.81.22.)

Nor are we persuaded that these findings should not be given preclusive effect. Defendant has not shown that the changes Assembly Bill No. 333 (2021-2022 Reg. Sess.) made to the laws regarding criminal street gangs (see, e.g., *People v. Clark* (2024) 15 Cal.5th 743, 752) alters the jury determinations, that defendant with intent to kill aided and abetted first degree murder. The *Curiel* court has already acknowledged and rejected the argument that changes to the definition of criminal street gang justified the application of the exercise of equitable discretion against issue preclusion for an intent to kill finding derived from a gang special circumstance. (*Curiel, supra*, 15 Cal.5th at p. 458, fn. 4 [this change did not alter "the substantive definition of intent to kill, so it has no bearing on the preclusive effect of the latter finding"].) We see no reason other parts of the same legislation should be afforded different treatment where none of them speak to the jury's intent to kill finding. Accordingly, we conclude defendant cannot establish a prima facie case for relief from his murder convictions under section 1172.6 as a matter of law.

## C.     *The Attempted Murder Convictions*

The trial court's order denying defendant's section 1172.6 petition did not expressly deny his supplemental argument requesting resentencing on his attempted murder convictions. Nonetheless, defendant has challenged the trial court's implicit rejection of this request.

Prior to the passage of Senate Bill No. 775 (2021-2022 Reg Sess.) (Senate Bill 775) (Stats. 2021, ch. 551), courts reviewing its applicability to final judgments had

15

determined that former section 1170.95 did not apply to final attempted murder convictions. (See, e.g., *People v. Turner* (2020) 45 Cal.App.5th 428, 436.)

However, Senate Bill 775 amended subdivision (a) of former section 1170.95 (now section 1172.6) to read, in pertinent part: "A person convicted of . . . attempted murder under the natural and probable consequences doctrine . . . may file a petition with the court that sentenced the petitioner to have the petitioner's . . . attempted murder . . . conviction vacated and to be resentenced on any remaining counts." (Stats. 2021, ch. 551, § 2.) This legislation took effect on January 1, 2022. (Cal. Const., art. IV, § 8; Stats. 2021, ch. 551.)

In light of this legislation, at the January 19, 2022 oral argument, the parties conceded that this matter should be remanded to allow the trial court to determine whether defendant can state a prima facie case for relief under amended section 1172.6 relevant to his attempted murder convictions. The parties have not expressed a different position following transfer from the California Supreme Court for reconsideration in light of *Curiel*. We accept the parties' earlier concession and will remand the matter for this purpose.

## III.  DISPOSITION

The matter is remanded with directions for the trial court to reconsider defendant's section 1172.6 request concerning his attempted murder convictions in light of the changes brought about by Senate Bill 775.  The court's order denying defendant's section 1172.6 petition concerning his convictions for murder is affirmed.


/S/

———————————————
RENNER, J.



We concur:


/S/

———————————
ROBIE, Acting P. J.


/S/

———————————
KRAUSE, J.

17